United States Court of Appeals
Fifth Circuit

**F I L E D**

February 17, 2005

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

No. 04-70008
_____

ROBERT ALAN SHIELDS,

                                        Petitioner - Appellant

        v.

DOUG DRETKE, DIRECTOR, TEXAS
DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION,

                                        Respondent - Appellee

---------------------
Appeal from the United States District Court for the
Southern District of Texas, Galveston
(3:99-CV-753)
---------------------

Before JOLLY, WIENER, and DENNIS, Circuit Judges.

PER CURIAM:[*]

    Petitioner-Appellant Robert Alan Shields seeks a certificate

of appealability ("COA") on multiple issues that the district

court deemed unworthy of collateral review.  Shields also appeals

the district court's order granting summary judgment in favor of

respondent-appellee Doug Dretke ("the State"). Shields further

appeals the district court's order denying an evidentiary hearing

under 28 U.S.C. § 2254(e)(2).

_____

    [*]    Pursuant to 5TH CIR. R. 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

Because Shields has failed to make a substantial showing of the denial of a constitutional right, we deny his application for a COA on all of his claims after a threshold inquiry on the merits. We further find that the district court did not abuse its discretion when it denied Shields an evidentiary hearing.

## I. PROCEEDINGS

In 1994, a Texas grand jury indicted Shields for the murder of Paula Stiner while in the course of committing and attempting to commit burglary and robbery. In 1995, a jury found Shields guilty of capital murder. After the penalty phase, the jury recommended the death penalty, and, in October 1995, the trial court sentenced Shields to death.

Shields directly appealed his conviction and sentence to the Texas Court of Criminal Appeals ("TCCA"). In 1998, the TCCA affirmed Shields's conviction and sentence.[1] Shields filed a motion for rehearing, which that court denied.

Shields timely filed an application for a writ of habeas corpus in the state trial court. The trial court entered findings of fact and conclusions of law, recommending that relief be denied.[2] The TCCA adopted the trial court's findings of fact

---

[1] See Shields v. State, No. 72,278 (Tex. Crim App. Feb. 25, 1998) (unpublished).

[2] See Ex parte Shields, No. 94CR1685-83 (112nd Judicial District Court of Galveston County, Texas, Oct. 14, 1998).

and conclusions of law and denied relief after its own review of the record.[3]

In 1999, Shields timely filed a petition for a writ of habeas corpus in the United States District Court for the Southern District of Texas. Shields's federal habeas petition contained numerous unexhausted claims. After the state filed its opposition to Shields's petition, in which it argued that the majority of Shields's claims were unexhausted and therefore procedurally barred, Shields moved to stay the proceedings pending his return to state court to exhaust the unexhausted claims. The district court granted the motion and allowed Shields to return to state court to exhaust his claims. The order further permitted Shields to refile his federal petition within 90 days if the TCCA denied relief. Pursuant to the district court's order, Shields filed a successive habeas application with the TCCA.

In 2002, the TCCA denied Shields's successive state habeas application as an abuse of the writ under state statute.[4] Shields then refiled his federal petition in the district court. In 2003, the district court denied Shields's petition, denied his

_____

[3] See Ex parte Shields, No. 72,278-01 (Tex. Crim. App. Dec. 9, 1998).

[4] See TEX. CODE CRIM. PROC. art. 11.071 § 5 (Vernon's 1999).

3

request for an evidentiary hearing, and rendered summary judgment in favor of the State. Shields filed a motion in the district court to alter or to amend its judgment under Federal Rule of Civil Procedure 59(e), and the district court denied the motion.

In February 2003, Shields sought a COA in the district court on 28 issues. Based on the TCCA's dismissal of Shields's successive habeas petition, the district court rejected the majority of Shields's claims as procedurally barred. After a threshold inquiry on the merits, the district court rejected those claims on which Shields had not procedurally defaulted. Shields now seeks a COA on these issues from this court.

## II. FACTUAL BACKGROUND

### A. Guilt-Innocence Phase

The evidence adduced at trial showed that Tracy Stiner, the victim's husband, arrived home from work shortly before 6:00 p.m. on September 21, 1994. He discovered his wife's body in the laundry room. Mrs. Stiner's body lay on its right side on the floor of the laundry room with her back to the washer and dryer. The room and the victim were covered in blood. The breakfast area of the house was in disarray, and the contents of Mrs. Stiner's purse were strewn about. There was also a hammer on the floor of the breakfast area. As Mr. Stiner searched the house, he noticed that several items — including several pair of socks,

4

shirts, a book bag, and a kitchen knife — were missing. Mr. Stiner testified that he later learned that, at 11:37 a.m. — a time when his wife would have been at work — a telephone call had been made from his home to the home of one of Shields's friends in Spring, Texas.

Dr. William Korndoffer, Galveston County's Chief Medical Examiner, testified that Mrs. Stiner had suffered a blunt trauma to the head and had been repeatedly stabbed in the throat, chest, and torso. Mrs. Stiner also suffered a number of defensive wounds, which indicated that she had struggled with her assailant before she died.

Detective Michael Wayne Tollett of the Friendswood Police Department testified that he was notified of Mrs. Stiner's murder around 6:16 p.m. on September 21 and arrived at the Stiner residence shortly thereafter. Tollett testified that police lifted Shields's fingerprints from the laundry room and that bloody shoe prints at the scene were consistent with Shields's shoes. Tollett found blood on the purse, the carpet, and a large amount of blood in the laundry room. He also found one screwdriver on the carpet below a broken window and a wooden-handled screwdriver outside. A cigarette butt found at the scene had saliva on it consistent with Shields's saliva. Mrs. Stiner's car was also missing.

The Shields family lived next door to the Stiners. Christine Shields, Shields's mother, testified that a police officer informed her of Mrs. Stiner's murder when she returned home on September 21. The next day, Mrs. Shields noticed that some items were out of place in her garage — cushions had been arranged to form a makeshift bed, and some drinks were nearby. Mrs. Shields also found Shields's pager and one of his shirts near the cushions, although Shields had not lived with his parents for several months and was not welcome in their home without at least one parent present. When Mrs. Shields learned from neighbors that a wooden-handled screwdriver like one that she and her husband owned had been used to break into the Stiner home, she began to suspect that her son was involved in the crime. She contacted the police and gave them Shields's friends' phone numbers where he might be reached.

Shields was arrested on September 24, 1994. At the police station, police noticed cuts on his hands. There was also a cut on his right chin and what appeared to be blood on his shoes, which the police took to the lab for analysis. Shields's underwear was also saturated with blood.

Shields's fingerprints were found on Mrs. Stiner's checkbook, on the door leading from the laundry room to the garage, and in Mrs. Stiner's car. Mr. Stiner identified several

of the items in Mrs. Stiner's car as having been in his home before his wife's murder. The bloody shoe impression at the crime scene matched the shoes that Shields wore at the time of his arrest. The blood obtained from Shields's underwear and from a paper towel at the Stiner home were consistent with Shields's blood.

Further, evidence showed that Shields had used Mrs. Stiner's credit card after the murder to purchase a suit. Mark Lang was manager of Dejaiz's Men's Clothing in Willowbrook Mall and was working on September 21. He testified that Shields came into the store around 6:15 p.m. and purchased a suit with a credit card in the name of Paula Stiner. Shields signed the credit card slip in the name of Tracy Stiner, Mrs. Stiner's husband. When Lang noticed a horizontal cut on Shields's finger, Lang was told by Shields that he had cut his finger while splicing wires at work. Shields also had a bandage around his middle finger on his left hand.

Several of Shields's friends also testified for the prosecution. Troy Sterner testified that he knew Shields in 1994 and, at that time, Shields was staying in vacant houses in the Woodlands area. Shortly after the murder, Sterner saw Shields with cuts on his hand. Shields told Sterner that he had cut them while working at a store.

Gina Cykala, a friend of Shields, testified that on the day of the murder she saw Shields at McDonald's at around 8:45 p.m. Shields was driving a big white car that she had never seen before. Shields told Cykala that he had borrowed the car from a friend.

Colin Checketts also testified that on September 21, Shields was driving a white car. Shields told Checketts that he had obtained the car from a friend, Ray Holt, and wanted to sell it for $500. He told Checketts that he had cut his hands while working at a store. He then gave Checketts the suit that he had purchased at Dejaiz's Men's Clothing Store. David Chastain and Jarrod Moore, two of Shields's friends, testified the same.

The defense put no witnesses on the stand during the guilt-innocence phase. After hearing all of this evidence, the jury returned a verdict of guilty.

## A. Penalty Phase

### 1. Evidence by the State

At the penalty phase, the State introduced evidence that Shields had been assessed deferred adjudication probation for theft/burglary of a motor vehicle in 1992, after which Shields completely disregarded the terms of his probation.

Authorities also arrested Shields in Florida in 1994 for grand theft auto. In January 1994, Shields and two friends,

8

Chastain and Checketts, broke into a car in Friendswood, stole a checkbook and a credit card and charged $150 in cigarettes before the card was reported stolen. Around the same time, the three friends broke into a house next door to Shields's and stole cash, car keys, and, later, the car itself. They then drove to Florida in the car, shoplifting along the way. They were arrested in Florida for grand theft auto. They had also attempted to break into a home in Florida, but they fled when a neighbor spotted them. The jury also heard testimony that in July 1994, Shields had been involved in stealing credit cards and a cell phone from another car.

Based on the testimony of Shields and his mother, the Florida court liaison officer recommended, and the court ordered, that the conditions of probation be amended to allow Shields to enter St. Joseph's Psychiatric Hospital for at least one month to receive psychiatric evaluation and possible drug treatment. After twelve days, the court allowed Shields to report on an outpatient basis. Shields later missed two appointments in July 1994. On August 10, Mrs. Shields urged the court officer to issue a warrant for Shields so that she could retrieve her missing car, which Shields had stolen.

John Matzelle, a friend of Shields, testified that in June 1994, Shields loaded a pistol and pointed it at him. When

9

Matzelle objected, Shields stood up and shoved the gun in Matzelle's face, stating that he "could point the fucking gun in [his] face if he felt like it." Shields later went in the backyard and fired the gun twice over the fence, returning to tell his friends that he "had just shot at his mail carrier." Detective Tollet testified that no mail carrier recalled a shooting incident on his route that day.

To refute the defense psychiatric testimony, the State also called Dr. Edward Gripon as a rebuttal witness. Responding to a hypothetical question that paralleled the facts of Paula Stiner's murder, Dr. Gripon testified that such an offender lacks concern and remorse for his own action. He further testified that Shields's psychiatric records demonstrate poor impulse control and aggressiveness. Dr. Gripon diagnosed Shields with "personality disorder with features of aggressivity, features of antisocial personality, which is the absence of a social conscience, not caring what one does, that sort of thing." Dr. Gripon testified that in his opinion, Shields is a future danger. Dr. Gripon never personally interviewed Shields.

## 2. Evidence by the Defense

Mrs. Shields testified that Shields had a close relationship with his family until two years after they moved to Colorado from Texas. At that point, Shields became withdrawn and did not get

along with his father. When the family moved back to Texas, Shields's grades were average, and he was a typical fifteen-year old. Shields's relationship with his family deteriorated after an arrest for theft. He began to associate with "undesirable" people and at times would disappear from home for a day or two. To ensure his graduation, the Shields decided to drop him off and to pick him up every day from high school. A month or two before graduation, however, Shields moved out of his parents' home without notice. Shields returned only to inform his parents that he could not live by his father's rules. When Shields left again, it was to Florida in a neighbor's stolen car.

Mrs. Shields arranged professional counseling for Shields in 1993, but he quit after three or four visits. Shields then refused to see another professional. By June 1994, Shields was no longer taking the anti-depressant medication that the St. Joseph's doctor had prescribed, and his behavior deteriorated. Shields left his parents' home for good in July 1994 to live in an abandoned house in the Woodlands. Mrs. Shields testified that in her opinion, Shields could not have murdered Mrs. Stiner unless Mrs. Stiner confronted him first. She also testified that she did not believe that he had entered the home with the intent to hurt Mrs. Stiner. On cross-examination, Mrs. Shields admitted that she and her husband had twice changed the locks on the house

11

to prevent Shields from breaking in and stealing.

Clinical social worker Fran St. Peter performed a biopsychosocial assessment on Shields. St. Peter performed a three-hour assessment on Shields the night before her testimony and interviewed Shields's mother, father, sister, and brother-in-law. St. Peter testified that one of Shields's close friends had been killed when Shields was eleven. The incident, she testified, traumatized him. The family's move to Colorado then isolated him and caused him to withdraw. St. Peter testified that Shields's first introduction to narcotics occurred when he was a thirteen- to fourteen-month old baby, when doctors prescribed medication to him to ease the pain after he burned himself. Shields tried Valium when he was eleven. St. Peter also testified that Shields had consumed alcohol continuously since the age of fourteen. By the age of seventeen, 70 to 75 per cent of Shields's time related to procuring, using, or recovering from drugs and alcohol. St. Peter questioned the Shields' attentiveness to their son and stated that the family essentially led separate lives.

Dr. Fred Fason testified as to Shields's alleged future dangerousness. He testified that a psychiatrist would need to perform a scientifically-based medical evaluation on an individual before making a diagnosis of future dangerousness. He

12

also stated that the American Psychiatric Society has recommended that its members not testify as to future dangerousness because no test has demonstrated that these opinions are scientifically valid. Responding to a hypothetical question that traced the facts of Paula Stiner's murder, Dr. Fason admitted that his diagnostic impression was that "he's a sociopath or antisocial personality disorder."

Dr. James Marquart, a professor of criminal justice at Sam Houston University and a sociologist, testified as to study results that show that the majority of former death row inmates in the general prison population do not commit acts of violence in the prison any more than any other prison inmate. Dr. Marquart testified that it is difficult to predict accurately future dangerousness based solely on the offense committed.

Perry Evans and Jose Lozano, employees of the Galveston County Sheriff's Department, testified that Shields was involved in four instances of jail misbehavior in over a year. Although officials had classified Shields as a minimum security inmate, they based this classification on Shields's representations that he had no prior criminal record, no chemical dependency problem, and lived at his family home. While in jail awaiting trial, Shields was involved in a fight, was in an unauthorized area, and destroyed, altered, or damaged county property or the property of

13

another.

After hearing both the State's and the defense's evidence, the jury answered the special issue question of future dangerousness in the affirmative and recommended death.

### III. LAW

Section 2253 of the Antiterrorism and Effective Death Penalty Act ("AEDPA") forecloses appeal from a state habeas proceeding unless a circuit justice or judge issues a COA.[5] We may issue a COA "only if the applicant has made a substantial showing of the denial of a constitutional right."[6] To make this showing, Shields must demonstrate that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."[7] If the district court denies relief on procedural, as opposed to constitutional grounds, "a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find

---

[5] 28 U.S.C. § 2253(c)(1)(A).

[6] Id. § 2253(c)(2).

[7] Miller-El v. Cockrell, 537 U.S. 322, 327 (2003) (citing Slack v. McDaniel, 529 U.S. 473, 483 (2000)).

14

it debatable whether the district court was correct in its procedural ruling."[8]

To determine whether to grant a COA, we are limited "to a threshold inquiry into the underlying merit of [Shields's] claims."[9]  This threshold inquiry "does not require full consideration of the factual and legal bases adduced in support of the claims."[10]  Instead, we base our determination on "an overview of the claims in the habeas petition and a general assessment of their merits."[11]  When the district or state court has imposed the death penalty, "any doubts as to whether a COA should issue must be resolved in [petitioner's] favor."[12]

Shields seeks a COA from this court on multiple issues:

(1)  The district court erred when it found that Shields procedurally defaulted on the majority of his ineffective assistance of counsel claims.

(2)  Trial counsel was ineffective in that he failed to present a viable defense during the guilt-innocence phase.
    (a)  The district court overlooked issues of disputed fact that entitled Shields to proceed on appeal as to all of his ineffective assistance of counsel

---

[8] Slack, 529 U.S. at 484 (emphasis added); Matchett v. Dretke, 380 F.3d 844, 847-48 (5th Cir. 2004).

[9] Miller-El, 537 U.S. at 327.

[10] Id. at 336.

[11] Id.

[12] Hernandez v. Johnson, 213 F.3d 243, 248 (5th Cir. 2000).

15

claims.

(b) Trial counsel failed to present evidence to contradict the state's theory that Shields had been "lying in wait" for the victim.

(c) Trial counsel was ineffective in that he refused to permit Shields to testify to present an alternative version of events and because he switched defense theories midway through trial.

(3) Trial counsel was ineffective during the guilt-innocence phase of the trial in that he:

(a) failed to object to the introduction of the hammer and knives found at the scene of the crime.

(b) failed to object to the testimony of Shields's mother, Christine Shields.

(c) failed to object to the admission of Shields's out-of-court statements to the Woodland subdivision witnesses.

(d) failed to consult with forensic evidence experts to rebut the state's case.

(4) Trial counsel's performance during opening and closing arguments at the guilt-innocence phase constituted ineffective assistance of counsel.

(a) Trial counsel failed to object to the state's opening argument that allegedly consisted of victim impact information and characterized the evidence of guilt as conclusive.

(b) Trial counsel failed to present an adequate closing argument.

(5) Trial counsel was ineffective during the guilt-innocence and punishment phases in that he failed to obtain a confidential defense psychiatric expert under Ake v. Oklahoma[13] to examine Shields.

(6) Trial counsel's performance during the state's case-in-chief at the punishment phase constituted ineffective assistance of counsel because he:

(a) failed to require the state to prove the extraneous offenses admitted as evidence of future dangerousness.

---

[13] 470 U.S. 68 (1985).

16

(b) allowed incompetent witnesses to testify and failed to investigate the witnesses to impeach them effectively.

(7) Trial counsel's performance during the defense's case-in-chief at the punishment stage constituted ineffective assistance of counsel because he:
(a) failed to present the theory of self-defense and Shields's alleged lack of intent to the jury as mitigating evidence.
(b) failed to investigate and to prepare Shields's background history and incompetently presented punishment phase evidence.
(c) failed to prepare adequately the mitigation specialist witness, Fran St. Peter.
(d) admitted damaging evidence through the mitigation specialist that would have otherwise been barred under Estelle v. Smith.[14]
(e) failed to present effectively mitigating evidence.
(f) failed to present a viable insanity defense or to present evidence on Shields's alleged diminished capacity.
(g) failed to use effectively defense experts Dr. Fason and Dr. Marquart.
(h) elicited positive answers to the special issues —— that the jury was to consider to determine whether to impose a life sentence or death —— from two defense witnesses.

(8) Trial counsel was ineffective in that he failed to present a coherent defense to the state's case on future dangerousness.

(9) Trial counsel's performance at the punishment phase was ineffective in that he:
(a) opened the door to the rebuttal testimony of Dr. Gripon by introducing psychiatric records produced by the state's mental health expert.
(b) introduced into evidence exhibits that suggested an affirmative answer to the special issues.
(c) failed to object to the state's hypothetical questions posed to Dr. Gripon.

---

[14] 451 U.S. 454 (1981).

(d) failed to request a hearing under Texas Rule of Evidence 705(b) and to object under <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>[15] to determine the scientific foundations of Dr. Gripon's opinion.

(10) Trial counsel was ineffective at the punishment phase in that he failed to object to the state's comment that Shields lacked remorse.

(11) The cumulative effect of trial counsel's errors prejudiced him and deprived him of effective assistance of counsel.

(12) Trial counsel conducted a deficient voir dire, thereby depriving Shields of his Sixth Amendment right to an impartial jury.

## IV. COA: Procedural Default

**Whether the trial court erroneously concluded that Shields procedurally defaulted on the majority of his ineffective assistance of counsel claims.**

We have always required that a habeas petitioner exhaust his claims in state court before proceeding to federal court on those claims: "[A] state prisoner seeking to raise claims in a federal petition for habeas corpus ordinarily must first present those claims to the state court and must exhaust state remedies."[16] "Under the procedural default doctrine, a federal court may not consider a state prisoner's federal habeas claim when the state based its rejection of that claim on an adequate and independent

---

[15] 509 U.S. 579 (1993).

[16] <u>Martinez v. Johnson</u>, 255 F.3d 229, 238 (5th Cir. 2001) (citing 28 U.S.C. § 2254(b)).

18

state ground."[17]  If the petitioner fails to present his claims to the appropriate state court, his claims are procedurally defaulted.  Defaulted claims "will not be regarded as a basis for granting federal habeas relief."[18]  Nevertheless, a petitioner may overcome any procedural default "if he can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law."[19]  "'Cause . . . requires a showing of some external impediment <u>preventing</u> counsel from constructing or raising the claim.'"[20]  To demonstrate prejudice, a petitioner must show "'not merely that the errors at . . . trial created a <u>possibility</u> of prejudice, but that they worked to his <u>actual</u> and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'"[21]

A petitioner may also overcome procedural default by

---

[17] <u>Martin v. Maxley</u>, 98 F.3d 844, 846 (5th Cir. 1996). Shields also argues that Texas's abuse-of-the-writ doctrine is not an adequate and independent state ground. For the reasons stated <u>infra</u>, <u>see</u> n. 70, we reject this argument.

[18] <u>Ogan v. Cockrell</u>, 297 F.3d 349, 356 (5th Cir. 2002) (citing <u>Martinez</u>, 255 F.3d at 239).

[19] <u>Id.</u>

[20] <u>McCleskey v. Zant</u>, 499 U.S. 467, 497 (1991) (quoting <u>Murray v. Carrier</u>, 477 U.S. 478, 492 (1986)) (emphasis in original).

[21] <u>Murray</u>, 477 U.S. at 494 (quoting <u>United States v. Frady</u>, 456 U.S. 152, 170 (1982)) (emphasis in original).

19

demonstrating that "failure to consider the claims will result in a fundamental miscarriage of justice."[22] To demonstrate a "fundamental miscarriage of justice," the petitioner must "establish that under the probative evidence he has a colorable claim of factual innocence" — or, "actual innocence."[23] A petitioner may demonstrate actual innocence during the guilt-innocence phase by showing that, in view of the identified constitutional error, "it is more likely than not that 'no reasonable juror' would have convicted him."[24] When the petitioner challenges a sentence of death, he must establish actual innocence by showing that "but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law."[25]

Shields contends that the district court erred when it held that he procedurally defaulted on the majority of his ineffective assistance of counsel claims. The district court held that Shields had procedurally defaulted on all of his claims except — as numbered in this opinion — 3(a), (9)(c), and (9)(d). Shields

---

[22] Coleman v. Thompson, 501 U.S. 722, 750 (1991).

[23] Sawyer v. Whitley, 503 U.S. 333, 339 (1992) (quoting Kuhlmann v. Wilson, 477 U.S. 436, 454 (1986)).

[24] Schlup v. Delo, 513 U.S. 298, 329 (1995).

[25] Sawyer, 503 U.S. at 336.

20

argues that during his state habeas proceeding, he filed in the TCCA an Emergency Motion to Abate Habeas Appeal and for Dismissal with Prejudice in which he (1) informed the court that habeas counsel was ineffective in failing to present numerous claims to the court; (2) asked the court to dismiss his habeas counsel; and (3) asserted his right to self-representation. Without providing reasons, the TCCA denied this motion outright.

Shields maintains that the state court's denial of his emergency motion — which, he urges, was a denial of his Sixth Amendment right to self-representation — constitutes cause and prejudice to excuse the procedural default. The State, on the other hand, contends that Shields merely asserts a claim for ineffective assistance of habeas counsel and that our precedent controls here.[26]

In Ogan v. Cockrell, the petitioner argued for the first time on appeal that the state court had denied him meaningful access to the courts, equal protection, and due process when it refused to "remedy its earlier error of appointing him ineffective [habeas] counsel."[27] While the application to the Texas Court of Criminal Appeals was pending, Ogan wrote a letter to the court, in which he asked the court to dismiss his habeas

---

[26] Ogan v. Cockrell, 297 F.3d 349 (5th Cir. 2002)

[27] Id. at 356.

21

counsel and appoint another attorney.[28] The letter also included a pro se motion that requested the removal of Ogan's appellate counsel and provided examples of counsel's alleged incompetence.[29]

The district court rejected Ogan's argument and dismissed several of Ogan's claims as procedurally barred because Ogan's appointed habeas counsel had failed to raise them before the state courts.[30] We affirmed the district court and in so doing, reaffirmed our long-standing holding that an ineffective assistance of state habeas counsel claim does not constitute sufficient cause to overcome the procedural bar because there is no constitutional right to competent habeas counsel.[31]

On its face, Ogan clearly forecloses Shields's arguments. Shields argues, however, that this matter is distinct from Ogan because he asserted his Sixth Amendment right to self-representation to the TCCA, which denied him that right. Noting that "cause" requires a force external to the petitioner that prevents him from developing the record and from asserting his claims to the state courts, Shields argues that the "Texas Court

---

[28] See id. at 365 n. 3.

[29] See id.

[30] See id. at 356.

[31] See id. at 357.

22

of Criminal Appeals' denial of Shields right to self-representation was the 'external force' and interference that made compliance not only impractical but impossible."

Shields's argument, although novel, is meritless. First, neither we nor the Supreme Court has established a federal constitutional right to self-representation on collateral review. Further, in Martinez v. Court of Appeal, the Supreme Court explicitly held that there is no federal constitutional right to self-representation on direct appeal from a criminal conviction.[32] It is implausible, therefore, that there would exist such a right on collateral review. Accordingly, the TCCA's denial of Shields's right to self-representation on collateral review does not demonstrate a substantial showing of the denial of a constitutional right sufficient to support the granting of a COA or to excuse his procedural default. Accordingly, we are barred from considering those claims that Shields failed to raise before the Texas courts and which the TCCA later dismissed as an abuse of the writ. Notwithstanding this bar, however, our independent review of the record demonstrates that the district court held that Shields had procedurally defaulted on one claim that we find he raised in his state petition.

---

[32] 528 U.S. 152, 163 (2000).

In his reply brief, Shields specifically argues that he did not procedurally default on claims (6) through (11).[33] Claim (11) charges that the cumulative effect of trial counsel's errors prejudiced him and deprived him of effective assistance of counsel. Shields specifically raised this issue in his state habeas application and thus has not waived it.

Less clear is whether Shields raised claims (6) through (10) in his state habeas petition. Shields argues that these five claims specifically challenge trial counsel's performance at the punishment phase and are not procedurally barred because his state habeas application specifically challenged trial counsel's performance during the punishment phase. In effect, Shields argues that because his state habeas application challenged trial counsel's performance at his punishment phase, he did not

---

[33] Shields also asserts that he preserved the other claims in his federal habeas petition before the district court that challenge errors at the guilt/innocence phase of the trial. Shields's state habeas petition belies this assertion. The only aspects of the trial challenged in Shields's state habeas application were the failure of trial counsel to object to (1) the testimony of Lang as to the credit card purchase of the suit two hours after the murder, and (2) the admission of the hammer and the knives. Whether on purpose on through inadvertence of counsel, Shields does not seek a COA on the failure to object to Lang's testimony at the guilt/innocence phase (although, as we discuss below, he does challenge the inclusion of this extraneous offense in the hypotheticals posed to Dr. Gripon at the punishment phase). As noted below, Shields has properly preserved his challenge to the hammer and the knives.

24

procedurally default on any claims that he raises in his federal petition that concern his punishment phase. We do not read Shields's state habeas petition so broadly.

Claim (6) alleges that trial counsel was ineffective during the punishment phase of the trial because he failed to require the state to prove the extraneous offenses, and allowed incompetent witnesses to testify. The substance of claim (6) challenges the testimony of John Hernandez, the probation officer, who testified that: (1) Shields committed car theft (for which he was never charged or prosecuted); (2) Shields had been institutionalized and had not continued his counseling when released; and (3) Shields's own family did not like him. Further, Claim (6) challenges the testimony of Chastain, Holt, and Matzelle.

Shields mentioned none of these witnesses in his state habeas application. Neither did Shields mention the extraneous offenses. Although Shields, in his state habeas application, mentions trial counsel's ineffectiveness in allowing testimony on the extraneous offenses at the guilt-innocence phase, the only witness (and extraneous offense) that the state habeas application challenged was Lang, who testified as to the purchase that Shields made after the murder using Mrs. Stiner's credit card. Lang did not testify during the punishment phase of the

25

trial.  Accordingly, to the extent that Shields now challenges any "extraneous offense" evidence at his punishment phase, Shields did not fairly present this claim to the state court and has procedurally defaulted on it.

Shields also asserts that he did not procedurally default on claim (7), which contains eight sub-claims.  With the exception of sub-claim (7)(f), we find no mention of the other claims in Shields's state habeas petition.  Shields specifically argued in his state habeas application that his trial counsel failed to present evidence on Shields's alleged brain defects during the punishment phase of his trial.[34]  In his federal petition, however, Shields alleges in sub-claim (7)(f) that trial counsel was ineffective in failing to present a viable insanity defense and evidence on Shields's alleged diminished capacity during the guilt/innocence phase of the trial.  We find no mention in Shields's state habeas petition that trial counsel was ineffective for failing to produce evidence of diminished capacity or insanity at the guilt/innocence phase, which, Shields argues, would have provided him with an affirmative defense to murder.  Accordingly, Shields did not fairly present this claim

---

[34] In his state habeas petition, Shields raised this claim of error with respect to the testimony of Fran St. Peter, who testified only during the punishment phase of the trial.

26

to the state court and is procedurally barred from bringing it now.

Claim (8) of Shields's federal petition alleges that trial counsel was ineffective at the punishment phase because he failed to present a <u>coherent defense</u> to the state's case on future dangerousness. Specifically, Shields contends that trial counsel failed to familiarize themselves "with the methods of risk assessment of future dangerousness" and failed to cross-examine Dr. Gripon "on the erroneous correlations in his analysis." In his state habeas application, Shields challenged the State's hypothetical questions posed to Dr. Gripon and trial counsel's failure to object to Dr. Gripon as an expert. Neither of these claims —— properly preserved in federal sub-claims (9)(c)-(d) —— challenged trial counsel's failure to present a "coherent defense." Accordingly, Shields has procedurally defaulted on this claim.[35]

Federal sub-claims (9)(a)-(b) contend that trial counsel was ineffective because he (a) opened the door to the rebuttal testimony of Dr. Gripon by introducing psychiatric records produced by the State's mental health expert, and (b) introduced into evidence exhibits that suggested an affirmative answer to

---

[35] In any event, the arguments in this claim are somewhat preserved in federal sub-claims (9)(c)-(d).

the special issues. Shields has procedurally defaulted on these two sub-claims. Nowhere in his state habeas petition did he challenge the introduction of exhibits at the punishment phase. Accordingly, Shields procedurally defaulted on these claims.

Federal claim (10) alleges that trial counsel was ineffective at the punishment phase in that he failed to object to the state's comment during closing argument that Shields lacked remorse. Specifically, Shields alleges that the State violated Griffin v. California[36] because the comment that Shields lacked remorse indirectly commented on Shields's refusal to testify, which is protected by the self-incrimination clause of the Fifth Amendment. After careful review of Shields's state habeas petition, we find no mention — direct or indirect — of this claim. It is, therefore, procedurally barred from our review.

Accordingly, we conclude that jurists of reason would not disagree with the district court's conclusion that Shields is procedurally barred from asserting the majority of his ineffective assistance of counsel claims. We agree with the district court that Shields properly preserved claims (3)(a), (9)(c), and (9)(d). We disagree with the district court that

---

[36] 380 U.S. 609 (1965).

Shields procedurally defaulted on claim (11), his cumulative error claim. We hold that jurists of reason could disagree whether the district court was correct in its procedural ruling on this claim.[37] Because Shields must also demonstrate the denial of a constitutional right on this claim,[38] however, we resolve below whether Shields is entitled to a COA on the four claims that he has properly preserved.

## V. COA: Preserved Claims (3)(a), (9)(c), (9)(d), and (11)

### A. Legal Standard

To be entitled to relief under the AEDPA, a habeas petitioner must show that the state court resolution of his case was either "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[39] Our review on a request for a COA is similarly circumscribed by the AEDPA, and "our duty is to determine not whether [Shields] is entitled to relief, but whether the district court's conclusion

---

[37] See Slack, 529 U.S. at 484.

[38] See id. at 485 ("Section 2253 mandates that both showings be made before the court of appeals may entertain the appeal.").

[39] 28 U.S.C. § 2254(d).

29

(that the state court adjudication was not contrary to or an unreasonable application of federal law) is one about which jurists of reason could disagree."[40]

As all of Shields's preserved claims relate to the ineffective assistance of his trial counsel, he must show both (1) that counsel's representation was deficient, and (2) that trial counsel's deficient performance prejudiced him.[41] If Shields fails to carry his burden on either element, we may reject his claim.[42]

To establish that counsel's performance was deficient, Shields must show that "counsel's representation 'fell below an objective standard of reasonableness.'"[43] Although no specific guidelines exist to evaluate attorney conduct, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms."[44]

To show that a deficient performance by trial counsel was

---

[40] Thacker v. Dretke, —— F.3d ——, 2005 WL 18542, at *2 (5th Cir. Jan. 5, 2005); see Williams v. Puckett, 283 F.3d 272, 277 (5th Cir. 2002).

[41] Strickland v. Washington, 466 U.S. 668, 687 (1984).

[42] See id. at 697.

[43] Soffar v. Dretke, 368 F.3d 441, 472 (quoting Strickland, 466 U.S. at 688).

[44] Strickland, 466 U.S. at 688.

prejudicial, Shields must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[45] "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."[46] Rather, we must determine whether "there is a reasonable probability that counsel's errors affected the outcome of the trial."[47] "A reasonable probability need not be proof by a preponderance that the result would have been different, but it must be a showing sufficient to undermine confidence in the outcome."[48]

## B.    Claim (3)(a)

Shield's first properly-preserved claim alleges that his trial counsel was ineffective during the guilt-innocence phase of the trial because he failed to object to the admission into evidence of the hammer and knives found at the scene of the crime.  With regard to both weapons, Shields specifically argues that he merits a COA on this claim because no evidence connected

---

[45] Id. at 694.

[46] Id. at 691.

[47] Soffar, 368 F.3d at 478.

[48] Williams v. Cain, 125 F.3d 269, 279 (5th Cir. 1997) (citing Strickland, 466 U.S. at 694).

the weapons to the crime, or, stated differently, no witness testified and no testing revealed that the weapons introduced by the prosecution were the weapons used during the crime.

Citing Texas Rule of Evidence 403, the district court rejected this claim on the grounds that the probative value of the hammer and the knives outweighed their prejudicial effect, and trial counsel need not raise a meritless objection. Agreeing with the state court, the district court found that if trial counsel had objected to the admission of this evidence, the state trial court would not have been wrong to overrule the objection.

We agree. Under both the Federal Rules of Evidence and the Texas Rules of Evidence, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.[49] The advisory committee's notes to Rule 403 define "unfair prejudice" as "an undue tendency to suggest decision on an improper basis, commonly though not necessarily, an emotional one," and we have adopted this definition.[50] When a defendant challenges evidence on the basis of Rule 403, we require courts to "look at the 'incremental probity' of the evidence in question in analyzing the offering party's need to

---

[49] FED. R. EVID. 403; TEX. R. EVID. 403.

[50] FED. R. EVID. 403 advisory committee's note; see also Jackson v. Johns-Manville Sales Corp., 750 F.2d 1314, 1334 (5th Cir. 1985).

32

make this form of proof and the tendency of the questioned evidence to invite an irrational decision."[51]

Viewing the hammer and the knives within this rubric, we find that their admission neither suggested a decision on an improper basis nor invited an irrational decision. The hammer and the knives were highly probative of the state's case. Tracy Stiner discovered the hammer on the floor of his home when he discovered his wife's body. He testified that this hammer was his and that it was in the garage when he left for work that morning. Detectives called to the scene found the hammer in the breakfast room together with an overturned chair, a purse, a checkbook, and an X-Ray folder from the doctor's office.[52] In addition, the medical examiner, Dr. Korndorffer, testified that Paula Stiner suffered a laceration on the top of her head and a contusion on her forehead consistent with blunt force trauma. Dr. Korndorffer testified further that these wounds were consistent with the hammer found at the scene. He also testified that Paula Stiner suffered blunt force trauma to her hands, which bent and damaged her rings and knocked the stone out of one of

---

[51] Jackson, 750 F.2d at 1334 (citing United States v. Beechum, 582 F.2d 898 (5th Cir. 1978) (en banc)).

[52] Evidence presented at trial showed that Paula Stiner left work early on the 21st to visit the doctor's office and, when she left, she was carrying a folder of X-Rays.

them.

Dr. Korndorffer testified additionally that the knife wounds to Paula Stiner's body were caused by a knife with a blade that was five inches long and three-fourths of an inch wide. Tracy Stiner testified that a knife with a blade of five inches length and a width of three-fourths of an inch was missing from the knife set on the counter, and the prosecution introduced the set of knives from the Stiner home to show that the missing one fit the descriptions of Dr. Korndorffer and Tracy Stiner.

We conclude that the probative value of the hammer and the knives is not outweighed by unfair prejudice. The record clearly demonstrates that the hammer was the one found at the scene. Record evidence regarding the knives belies Shields's assertion that they were irrelevant, given Mr. Stiner's testimony that the one knife missing from the set fit the description of the weapon that caused the stab wounds to Paula Stiner's body.

More importantly, because Shields specifically argues that no testimony or evidence proved that these were the weapons used to perpetrate the crime, we view Shields's claims of error to the admissibility of the weapons as a challenge to their "chain of custody." As we have explained, "[i]n cases where the defendant questions whether the evidence offered is the same as the items actually seized, the role of the district court is to determine

34

whether the government has made a prima facie showing of authenticity."[53] A "break in the chain of custody simply goes to the weight of the evidence, not its admissibility."[54] The above-noted record evidence establishes that the State made out a prima facie case of authenticity. Consequently, any possible break in the chain of custody would only go to the weight the jury accorded the hammer and the knives.

We cannot say that trial counsel was ineffective for failing to object to the admission of the hammer and the knives. Shields has failed to make a substantial showing of the denial of a constitutional right with regard to his evidentiary challenge. Thus, we decline to issue a COA on this claims.

## C.   Claim (9)(c)

Shields advances that trial counsel was ineffective because he failed to object to the hypothetical questions on future dangerousness that the State posed to Dr. Gripon at the punishment phase of the trial. The prosecutor posed three such questions to elicit Dr. Gripon's opinion on Shields's future dangerousness:

I would like to go over a hypothetical question

---

[53] United States v. Sparks, 2 F.3d 574, 582 (5th Cir. 1993).

[54] Id. (citing United States v. Shaw, 920 F.2d 1225, 1229-30 (5th Cir. 1991)); see also United States v. Dixon, 132 F.3d 192, 197 (5th Cir. 1997) (quoting Sparks).

with you, Doctor: Assume with me that the murder was committed, the murder of Paula Stiner was committed by a 19-year-old male who burglarized her home and who laid in wait for his victim, Paula Stiner, for 5 ½ hours.  And during that time he used the phone, he gathered up items that he wanted to steal, he fixed himself some food in a skillet, he selected his weapons which were a hammer and a knife.

Assume further with me the victim entered the house who was immediately assaulted with the hammer, then the knife, struck some 27 or more times; and during her horrific struggle to survive, was overcome and died 10 to 15 minutes after the initial assault began.

Assume with me further that immediately after the assault on the victim that the Defendant went over to the victim's purse which was only a very short distance away from her body, rummaged through the purse, taking what he wanted, including credit cards, [and] the keys to her car, which was parked in the garage.

Assume that the person drove to a shopping mall in Paula Stiner's car.  Within about an hour and a half of having committed the murder, he was at the mall.  He purchased items of clothing.  He was described as cool, polite, calm.  He said that the card was his mother's credit card.

Tell us, Doctor, what does that behavior tell you as a psychiatrist?


Assume further that the man, about two hours or so later, met with some friends of his at a fast food restaurant and again acted normal; was not intoxicated, according to them; claimed that the car he was driving was borrowed from a friend, that it was even for sale.

Assume further that later that evening he went out with one of his friends to a nightclub in the Montgomery County area, acted normal, had some beers, just had a good time.

What does that behavior tell you, Doctor, about that person?


Assume that during the year prior to the murder that the man stole from his parents, he burglarized his

36

parents' home. What does that tell you? What does that behavior tell you, Doctor?

In response to these hypothetical examples, Dr. Gripon testified that the described behavior demonstrates premeditation, viciousness, and a lack of concern for the victim shown by "the going about [of] the normal activities of life as if nothing had actually happened." He stated that "[a] person who can do that has little concern for their fellow man, if any." Dr. Gripon also stated that such behavior demonstrates a lack of responsibility and a "rather callous, very hard nature."[55]

Shields asserts that the hypothetical scenarios exaggerated and mischaracterized the facts of the crime. Shields also contends that the extraneous offenses — such as the credit card purchase — should not have been included in the hypothetical questions.

Shields's arguments are meritless. He does not explain how the hypothetical examples mischaracterize or exaggerate the facts that the State presented at trial. Based on our review of the record, the hypothetical presentations neither mischaracterized

---

[55] Shields relies heavily on this argument because in the affidavit of an investigator who interviewed the jurors after the jury imposed the death penalty — attached to his state habeas application — one of the jurors stated that Dr. Gripon made a better presentation on future dangerousness than the defense witnesses and that "[s]he believe[d] that all of the other jurors felt the same way about Dr. Gripon."

37

nor exaggerated the facts of Paula Stiner's murder. Rather, they paralleled the evidence that the state introduced at trial. If trial counsel had objected, his objection would have been meritless. The failure to raise meritless, futile objections does not constitute ineffective assistance of counsel.[56]

As for Shields's "extraneous offenses" argument, he fails to point to an extraneous offense in the hypothetical examples. Our review of Shields's state habeas petition does reveal, however, that he referred to Mark Lang's testimony about the credit card purchase of the suit that occurred two hours after the murder. The record clearly reflects that Lang testified to the facts that the prosecutors included in the hypothetical questions.

Further, we reject any possible argument that Shields makes with regard to the admissibility and use of such testimony. Tracy Stiner testified that when he arrived home on the day of the murder, he found his wife's purse and its contents scattered around on the floor of their breakfast area. He also testified that Mrs. Stiner carried several credit cards in her purse. Lang testified that on that same day, Shields used a credit card to purchase $271.71 in clothing from DeJaiz's. The name on the card

---

[56] See Clark v. Collins, 19 F.3d 959, 966 (5th Cir. 1994); Koch v. Puckett, 907 F.2d 524, 527 (5th Cir. 1990) (citing Murray v. Maggio, 736 F.2d 279, 283 (5th Cir. 1984) (per curiam)).

38

was Paula Stiner.  Shields, identified by Lang, signed the charge using the name Tracy Stiner, the victim's husband.  Lang's testimony tied Shields to the scene of the crime —— where he stole the credit card —— and to the attack itself.

Such testimony is clearly admissible.  Any objection to this testimony under Texas Rule of Evidence 404(b), as Shields appears to urge, would have been futile.  Under Texas Rule of Evidence 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith."[57]  The prosecution did not use the testimony of Lang —— or any corroborating evidence —— to prove the character of Shields.  This evidence had relevance apart from any possible tendency to prove Shields's character.[58]

Further, under our and Texas law, "[f]ruits of the same crime are admissible and do not constitute an extraneous offense."[59]  Shields's use of Paula Stiner's credit card

---

[57] TEX. R. EVID. 404(b).  This language tracks that of federal Rule of Evidence 404(b).

[58] See United States v. Posada-Rios, 158 F.3d 832, 871 (5th Cir. 1998); Alba v. State, 905 S.W.2d 581, 585 (Tex. Crim. App. 1995).

[59] Skidmore v. State, 530 S.W.2d 316, 321 (Tex. Crim. App. 1975); see also United States v. Price, 877 F.2d 334, 337 (5th Cir. 1989) ("Where evidence is inextricably intertwined with the charged offense, it is relevant and not extraneous. If the challenged extraneous evidence is inseparable from the evidence of the charged offense, it is unnecessary to consider its

constituted fruits of his crime.   We are satisfied that jurists

of reason would not debate the district court's ruling in this

regard, and we deny a COA on this claim.

**D.    Claim 9(d)**

Shields insists that his trial counsel was ineffective for

failure to (1) object to Dr. Gripon's testimony based on the

inadmissible reports on which Dr. Gripon based it,[60] and (2)

challenge Dr. Gripon under Texas Rule of Criminal Evidence 702.

Specifically, Shields emphasizes that trial counsel failed to

voir dire Dr. Gripon under Texas Rule of Criminal Evidence 705(b)

to determine the foundations of his opinion.   Shields also

contends that trial counsel failed to challenge Dr. Gripon's

qualification as an expert under Texas Rule of Criminal Evidence

702.   We reject Shields's arguments and decline to issue a COA on

this claim.

Texas Rule of Criminal Evidence 705(b) "allows counsel to

voir dire expert witnesses outside the presence of the jury to

---

admissibility under Rule 404(b).") (citations and quotations
omitted).

[60] Contrary to the state's argument and the district court's
finding, Shields explicitly argued in his state habeas petition
that Dr. Gripon testified on the basis of reports that were never
admitted at trial.

40

learn what facts the expert is basing his or her opinion on."[61] "[N]either the rule nor the case law creates a presumption of error if counsel fails to request voir dire."[62]  Texas courts have often held that the rule is not violated when nothing in the record indicates that counsel did not know on what facts the expert witness based his opinion.[63]  In other words, when defense counsel knows the basis of the expert's opinion, there is no need to invoke this rule.[64]

Here, the record confirms beyond cavil that defense counsel was cognizant of the reports on which Dr. Gripon based his opinion.  Although Shields points to no specific reports in his federal petition, in his state habeas petition, he challenged Dr. Gripon's reliance on the reports of Drs. Felthous, Barrett, Hungerford, Franke, and Freedman.  If Shields knew of the basis of Dr. Gripon's opinion, his counsel must have.  Further, Dr. Gripon explicitly testified at trial that he based his opinion on these reports.  It is thus clear that because defense counsel knew of the basis of Dr. Gripon's opinion, it would have been

---

[61] Saenz v. State, 103 S.W.3d 541, 546 (Tex. Ct. App. 2003); see Brown v. State, 974 S.W.2d 289, 292 (Tex. Ct. App. 1998).

[62] Saenz, 103 S.W.3d at 546; Brown, 974 S.W.2d at 292.

[63] Saenz, 103 S.W.3d at 546; Brown, 974 S.W.2d at 292.

[64] Saenz, 103 S.W.3d at 546; Brown, 974 S.W.2d at 292.

futile to invoke Rule 705(b).

In addition, we note that Shields provides no explanation as to why any of the reports on which Dr. Gripon based his testimony would have been inadmissible. In any event, under Texas Rule of Criminal Evidence 703, an expert "can . . . base his opinion partially on facts or data which is inadmissible, if such information is commonly relied upon by experts within his field."[65] We perceive no ineffective assistance in counsel's failure to challenge Dr. Gripon's reliance on, inter alia, the autopsy report of Dr. Hungerford and psychiatric reports on Shields from 1993. In addition, our review of the trial transcript convinces us that defense counsel cross-examined Dr. Gripon, including questioning him at the opening of his testimony with regard to the validity of his expert opinion. There is no merit to this claim.

Shields also insists that trial counsel was ineffective because he failed to object to Dr. Gripon on the basis of Daubert v. Merrell Dow Pharmaceuticals, Inc.[66] Specifically, Shields argues that "the methodology used by Dr. Gripon was inadequate and unreliable under the Daubert test because he based his

---

[65] Joiner v. State, 825 S.W.2d 701, 707–08 (Tex. Crim. App. 1992) (citing Nethery v. State, 692 S.W.2d 686, 702 (Tex. Crim. App. 1985)).

[66] 509 U.S. 579 (1993).

42

assessment of future dangerousness <u>entirely</u> on his judgment, not on any empirical data concerning base rates of violence of life-sentenced prisoners convicted of capital murder, nor on any other data that the science of violence risk assessment recognizes."

As noted, though, Dr. Gripon based his psychiatric opinion on future dangerousness on the records that related to Shields and Paula Stiner's murder. Even though we are somewhat troubled by the absence of a personal interview of Shields by Dr. Gripon,[67] we cannot say that counsel was ineffective in failing to make a <u>Daubert</u> objection to Dr. Gripon's testimony. Our review of the record demonstrates that Dr. Gripon adequately established his expert credentials, which included prior testimony as to the future dangerousness of a perpetrator on between twelve to eighteen occasions. We have also noted our awareness of no clearly established law that prevents a psychiatrist from basing his opinion on the records of the case and the psychiatric records of the perpetrator. Shields has established no prejudice here.

Although trial counsel did not object to the testimony of Dr. Gripon, the defense did put on its own expert witnesses during the punishment phase to rebut Dr. Gripon's testimony. Dr.

---

[67] See <u>Flores v. Johnson</u>, 210 F.3d 456, 458 (5th Cir. 2000) (Garza, J., specially concurring).

Fason testified as to the possible unreliability of future dangerousness testimony, and Dr. Marquart testified that studies reveal that capital inmates are no more likely to commit future violent acts than any other inmates. Trial counsel was not ineffective when he elected to rely on rebuttal witnesses to discredit Dr. Gripon's testimony instead of futilely filing a Daubert objection. We reject Shields's arguments and deny a COA on this claim.

### E. Claim (11)

In his final properly-preserved claim of error, Shields argues that he deserves a COA on his claim that the cumulative effect of trial counsel's error denied him ineffective assistance of counsel. As we conclude that there was no such error, however, there can be no cumulative error.[68]

### F. Conclusion

For the foregoing reasons, we deny a COA on Shields's properly-preserved claims. We hold that jurists of reason would not debate the district court's rulings. The district court did not err when it denied Shields a COA on these claims and granted summary judgment in favor of the State.

---

[68] See United States v. Moye, 951 F.2d 59, 63 n.7 (5th Cir. 1992) ("Because we find no merit to any of Moye's arguments of error, his claim of cumulative error must also fail.").

44

## VI. Evidentiary Hearing

Shields also urges that the district court erred when it failed to grant his request for an evidentiary hearing on his COA claims. Shields reiterates many of the arguments that he raised in his challenge to the district court's ruling on his procedural default claims. Shields contends that 28 U.S.C. § 2254(e)(2) does not bar an evidentiary hearing here because he did not fail to develop the factual bases of his claims in state court.[69] Shields asserts that because the Texas courts impeded the factual development of his claim ⸺ thus involving no failure on his part ⸺ Section 2254(e)(2) does not apply. Shields maintains that he is entitled to an evidentiary hearing to resolve factual disputes that concern

_____

[69] Section 2254 provides

(2) <u>If the applicant has failed to develop the factual basis of a claim in State court proceedings</u>, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that ⸺
(A) the claim relies on ⸺
(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.
28 U.S.C. § 2254(e)(2) (emphasis added).

procedural default, and those relating to "cause" and "prejudice" include the competence of counsel, whether state action impeded Petitioner's ability to present his claims on direct appeal and on state habeas, whether the basis of trial counsel's decisions were tactical or negligent and prejudicial, and the many other factual issues detailed herein.

Shields further contends that the district court erred when it did not grant him an evidentiary hearing because the state court never "adjudicated" his claims, but only issued a perfunctory one-page denial to the 600-plus-page petition.[70]

Accordingly, pursuant to Section 2254(e)(2), because Shields does not contend that his claims of error rely on a new rule of constitutional law or a factual predicate that he could not have discovered with due diligence, he is not entitled to an evidentiary hearing if he failed to develop a factual basis for his claim in the state court proceedings.[71]

Shields was not diligent in pursuing the factual predicates of his claims. He contends that he exercised due diligence by

---

[70] Shields also contends that he is entitled to an evidentiary hearing on whether Texas's abuse-of-the-writ doctrine is an adequate and independent state ground. This argument is foreclosed by our holding in Emery v. Johnson, 139 F.3d 191, 195-96 (5th Cir. 1997), that Texas's abuse-of-the-writ doctrine constitutes an adequate state ground. In Barrientes v. Johnson, 221 F.3d 741, 759-60 (5th Cir. 2000), we held that the doctrine has constituted an independent state ground since the TCCA's decision in Ex parte Berber, 879 S.W.2d 889 (Tex. Crim. App. 1994).

[71] See Williams v. Taylor, 529 U.S. 420, 429-30 (2000); McDonald v. Johnson, 139 F.3d 1056, 1059 (5th Cir. 1998).

requesting an evidentiary hearing in state habeas proceedings, and that the state court impeded any factual discovery when it perfunctorily denied his request. In sum, he asserts that Section 2254(e)(2) is inapplicable here. Shields concedes, however, that he devoted only one line of his 600-plus-page state habeas petition to his request for an evidentiary hearing, when he asked that he "be accorded an evidentiary hearing on the allegations in this petition." Although the Supreme Court has said that "failure to develop the factual basis of a claim" connotes fault on the part of the petitioner, we have held that "[m]ere requests for evidentiary hearings will not suffice; the petitioner must be diligent in pursuing the factual development of his own claim."[72] Shields points to no factual dispute that the state court, or, for that matter, the district court, could have resolved by granting his request for an evidentiary hearing. Neither does Shields proffer any specific evidence that would change the state or district courts' resolution of his claims.

Even if we were to determine that Shields did not fail to develop the factual basis of his claim in state court, "overcoming the narrow restriction of § 2254(e)(2) does not guarantee a petitioner an evidentiary hearing, it merely opens

---

[72] Dowthitt v. Johnson, 270 F.3d 733, 758 (5th Cir. 2000).

47

the door for one."[73] The district court still retains discretion to grant or to deny an evidentiary hearing under Rule 8 of the Rules Governing Section 2254 cases.[74] To obtain a hearing, Shields would have "to show either a factual dispute which, if resolved in his favor, would entitle him to relief or a factual dispute that would require development in order to assess a claim."[75]

Shields procedurally defaulted on the majority of his claims. As such, we are barred from considering those claims, evidentiary hearing or not. The alleged ineffective assistance of Shields's state habeas counsel does not constitute cause for the procedural default, and an evidentiary hearing would have shed no light on this issue.[76]

As to those claims on which Shields did not procedurally default, the district court did not abuse its discretion when it denied his request for an evidentiary hearing. We have held that

---

[73] Murphy v. Johnson, 205 F.3d 809, 815 (5th Cir. 2000).

[74] RULES GOVERNING § 2254 CASES 8(a); see Murphy, 205 F.3d at 815.

[75] Id. at 815; see Robison v. Johnson, 151 F.3d 256, 268 (5th Cir. 1998).

[76] Ogan, 297 F.3d at 357; see also Holland v. Jackson, —— U.S. ——, 124 S. Ct. 2736, 2738 (2004) (per curiam) ("Attorney negligence, however, is chargeable to the client and precludes relied unless the conditions of § 2254(e)(2) are satisfied.").

"where a district court has before it sufficient facts to make an informed decision regarding the merits of a claim, a district court does not abuse its discretion in refusing to grant an evidentiary hearing (even where no factual findings are explicitly made by any state court)."[77]   Our review of the instant record demonstrates that the district court reviewed the pleadings, the record, and all of the evidence in support of Shields's claims.   Indeed, even though the district court held that Shields had procedurally defaulted on the majority of his claims, it went on to address the merits of those claims, further supporting our conclusion that it thoroughly reviewed the record.

Moreover, we have held that conclusional and unsupported allegations do not entitle a habeas petitioner to an evidentiary hearing.[78]   Our review of this record demonstrates that Shields offers us no specific evidence that the jury did not consider at trial.   Neither does he point to any specific evidence that would create a factual dispute as to the four claims on which he did not procedurally default.   The district court had before it the affidavit of Shields's state habeas counsel and still determined, as we have done, that state habeas counsel's alleged

---

[77] Murphy, 205 F.3d at 816 (citing McDonald v. Johnson, 139 F.3d 1056, 1060 (5th Cir. 1998)).

[78] See id. (citing Ward v. Whitley, 21 F.3d 1355, 1367 (5th Cir. 1994)).

49

ineffectiveness does not constitute a sufficient factual dispute to require an evidentiary hearing. The Rules Governing Section 2254 cases "'do[] not authorize fishing expeditions.'"[79]

## VII. CONCLUSION

For the foregoing reasons, we hold that the district court did not err when it denied a COA to Shields and denied Shields an evidentiary hearing. We therefore deny Shields's application for a COA.

COA DENIED.

---

[79] Id. at 816-17 (quoting Ward, 21 F.3d at 1367).